# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

      Plaintiff,

      vs.                                           No. **CR 02-657 MCA**

**GERARDO LECHUGA-LABRADA**, and
**EDGAR OMAR TAMAYO-ARECHIGA**,

      Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING DEFENDANTS' MOTION TO SUPPRESS

      **THIS MATTER** came before the Court on the Motion and Memorandum Brief to Suppress Methamphetamine and Cocaine Recovered from Defendants' Vehicle and Post-Arrest Statements of the Defendant [Doc. No. 27] filed by Defendants Gerardo Lechuga-Labrada and Edgar Omar Tamayo-Arechiga on May 31, 2002. On June 26, 2002, and July 1, 2002, the Court held an evidentiary hearing on Defendant's motion in Albuquerque, New Mexico.

      The question before the Court is whether a state highway patrol officer had reasonable suspicion to stop the vehicle in which Defendants were traveling under circumstances where the officer observed, prior to the stop on an interstate highway: (1) an out-of-state (Arizona) license plate, (2) dark tinted windows, (3) no violation of any traffic laws, and (4) nothing

that raised any safety concerns with respect to the manner in which the vehicle was being driven or the safety of other vehicles on the highway. Having fully considered the pleadings of record, the applicable law, the evidence and the arguments of counsel presented at the hearing, and being fully advised in the premises, the Court determines that the answer is "No." The Court **GRANTS** Defendants' Motion to Suppress based upon the following findings of fact and conclusions of law.

## I.    FINDINGS OF FACT

1.    New Mexico State Police Sergeant Mike Valverde was on routine traffic patrol along Interstate 40 (I-40) west of Albuquerque, New Mexico, between approximately 11:20 a.m. and 11:50 a.m. on or about April 5, 2002, when the events described below occurred.

2.    While traveling westbound on I-40 near Mile Marker 132 in a marked police vehicle, Sergeant Valverde observed a silver Caprice with darkly tinted windows traveling in the opposite direction in the eastbound lane of the highway. Based solely on a suspicion that the tinting of the vehicle's windows might be in violation of a provision of New Mexico's Motor Vehicle Code, see N.M. Stat. Ann. 66-3-846 & 66-3-846.1 (Michie 1978 & Supp. 2001), Sergeant Valverde turned his vehicle around in the median and made his headlights flash in a "wig wag" pattern to clear the traffic in front of him so that he could catch up to the silver Caprice.

3.    As he followed the Caprice, and before stopping the vehicle, Sergeant Valverde observed that an Arizona license plate was clearly displayed on the rear of the vehicle.

4.     At no time prior to stopping the vehicle did the officer contact his dispatcher in order to run a check on the vehicle's license plate or registration.

5.     Except for the vehicle's darkly tinted windows, Sergeant Valverde observed no other condition of the silver Caprice or conduct by its occupants prior to the stop that aroused his suspicions as to the violation of any law.  Sergeant Valverde did not articulate any specific safety hazard relating to the tinted windows.

6.     At the suppression hearing, the Court questioned Sergeant Valverde as follows:

Q.     (By the Court.)  You testified, sir, that you decided upon stopping this vehicle because of the tinting that you believed to be very dark and, in your opinion, in violation of the New Mexico Statute.

A.     Yes, ma'am.

Q.     Were there any other matters that you considered in making the decision to stop the car?

A.     No, none whatsoever.

        THE COURT:  All right, I have no other questions.  Counsel, in light of that question?

        MS. BACKINOFF:  No.

        MR. WINTERBOTTOM:  No, Your Honor.

        THE COURT:  Thank you, sir.

7.     Sergeant Valverde pulled behind the silver Caprice with the tinted windows and turned on his red emergency lights and camera, whereupon the vehicle promptly pulled over to the side of the highway and stopped.

8.     When the silver Caprice stopped beside the highway, Sergeant Valverde stopped his vehicle behind it, approached the passenger side of the vehicle on foot, and knocked on the front passenger window.  Sergeant Valverde looked through the front passenger window and saw that the driver was having a hard time finding the controls to lower the window.

9.     Within a matter of seconds, the occupants of the silver Caprice lowered the front passenger window and began conversing with Sergeant Valverde.  The conversation took place in English and Spanish, with the occupants having a limited ability to converse in English and Sergeant Valverde having a limited ability to converse in Spanish.

10.     The officer informed the occupants of the silver Caprice that they had been stopped because their window tinting was too dark and reflective.  He also asked for the driver's license and the registration and insurance documents for the vehicle.

11.     As Sergeant Valverde waited for the requested documents, he smelled a strong, fragrant, air-freshener type odor emanating from the open window of the silver Caprice.  He also observed that the vehicle's ignition key was on a ring with only one other key and that there was a medallion with an image he recognized as "Jesus Malverde" hanging from the vehicle's ashtray.  He did not observe any luggage in the vehicle.

12.     Based on his training and experience, Sergeant Valverde regarded "Jesus Malverde" as a folk hero or saint revered by drug traffickers from the Mexican State of Sinaloa.  The officer also knew from his training and experience that air fresheners are sometimes used in an attempt to conceal the odor of contraband and that a key ring with only

one or two keys on it may indicate a vehicle does not belong to the driver or is being used by that driver for only a short period of time.

13.     In response to Sergeant Valverde's request, Defendant Tamayo-Arechuga, who was driving the silver Caprice, produced a driver's license issued by the Mexican State of Jalisco.    Defendant Lechuga-Labrada, who was the only passenger in the vehicle, subsequently produced a Mexican consular identification card.

14.     At no time did Sergeant Valverde ask whether Defendants were in the United States legally or question their immigration status.

15.     One of the Defendants also produced a vehicle-registration form for the silver Caprice, which indicated that the vehicle had been registered in San Luis, Arizona, on April 1, 2002.

16.     Based on his training and experience, Sergeant Valverde believed that San Luis, Arizona is a border community that is frequently associated with drug trafficking.

17.     Sergeant Valverde instructed Defendant Tamayo-Arechiga to accompany him back to his police vehicle, and Defendant Tamayo-Arechiga complied with this instruction. Defendant Lechuga-Labrada remained in the vehicle per the officer's instructions.

18.     In the police vehicle, Sergeant Valverde began to review the vehicle registration form.

19.     The officer continued conversing with Defendant Tamayo-Arechiga.

20.     Defendant Tamayo-Arechiga indicated that he was going to Albuquerque to do some work.  He could not identify the owner of the vehicle to Sergeant Valverde's

satisfaction, although he did indicate that the vehicle belonged to an individual named "Maria" or that individual's spouse.

21.    Sergeant Valverde contacted his dispatcher, requested a computer check, and instructed his dispatcher to try to contact the registered owner of the vehicle.

22.    The computer check indicated that the vehicle had not been reported stolen, but the dispatcher was unable to contact the vehicle's registered owner.

23.    At all relevant times, Sergeant Valverde knew that the window-tinting statute only applied to vehicles registered in New Mexico or required to be registered in New Mexico.

24.    Nevertheless, he proceeded to issue the citation for violation of New Mexico's window-tinting statute and instructed the dispatcher to summon another officer to the scene of the stop.

25.    At the time that Sergeant Valverde issued the citation, he knew that the statute did not apply to the subject vehicle because the vehicle was properly registered in the State of Arizona.

26.    At the suppression hearing, Sergeant Valverde offered no reason as to why he proceeded to issue the citation when he knew that the New Mexico statute did not apply as to this vehicle or driver.

27.    While Sergeant Valverde was in the police vehicle with Defendant Tamayo-Arechiga, Defendant Lechuga-Labrada waved his hand outside the window of the silver Caprice, indicating that he had found an insurance document requested by Sergeant

Valverde. The officer retrieved the insurance document and noted that it covered a two-month period between September and November 2001.

28.     Sergeant Valverde also questioned Defendant Lechuga-Labrada and reviewed his identification card to determine if he was the owner of the silver Caprice.

29.     Defendant Lechuga-Labrada's identification card indicated that he was living in Phoenix, Arizona, and was originally from Sinaloa, Mexico. Defendant Lechuga-Labrada indicated that he did not know who owned the silver Caprice; he also indicated that he was going to Albuquerque to pick up a girl.

30.     After questioning the Defendants, reviewing their documentation, and writing a traffic citation which stated that the window tinting was "too dark," Sergeant Valverde handed the citation and all of the license, registration, and insurance documents to Defendant Tamayo-Arechiga. As Defendant Tamayo-Arechiga began walking back to the silver Caprice, Sergeant Valverde called him back and handed him an envelope within which the fine for the citation could be mailed.

31.     At the time Sergeant Valverde issued the traffic citation to Defendant Tamayo-Arechiga, he began to suspect that Defendants were involved in criminal activity.

32.     In further conversing with Defendant Tamayo-Arechiga, Sergeant Valverde stated that there was a "little problem" and proceeded to ask him whether he had any drugs, weapons, or large amounts of money in the vehicle. Defendant Tamayo-Arechiga responded in the negative.

33.     When the officer asked about methamphetamine, he had to ask the question twice, and Defendant Tamayo-Arechiga looked down and changed his demeanor.

34.     Sergeant Valverde then asked for Defendant Tamayo-Arechiga's permission to check the vehicle.

35.     Defendant Tamayo-Arechiga answered "Yes," whereupon the officer presented a written consent-to-search form in English and Spanish, which Defendant Tamayo-Arechiga signed.

36.     Sergeant Valverde repeated the same procedure with respect to Defendant Lechuga-Labrada, who also denied possession of any drugs, weapons, or large amounts of money and signed the consent-to-search form.

37.     While Sergeant Valverde was questioning and requesting consent to search from Defendant Lechuga-Labrada, Officer Ramos of the New Mexico State Police arrived on the scene.  Another officer arrived at the scene a couple of minutes after Officer Ramos arrived.

38.     After obtaining the signed consent-to-search forms from the Defendants, the officers patted them down and moved them to a secure location beside the highway.

39.     Sergeant Valverde then summoned his dog, "Tosca," and accompanied the dog to the silver Caprice for the purpose of detecting whether the odor of narcotics was emanating from the vehicle.

40. Sergeant Valverde's dog, "Tosca," is a certified drug-detection dog that is trained to detect the odor of cocaine and methamphetamine and to passively indicate to such odors by sitting down.

41. In this case, the dog showed no interest in the exterior of the silver Caprice.

42. When directed to enter the passenger compartment of the vehicle, however, the dog indicated to the right dash door area and the rear back seat area.

43. After the dog indicated to the two areas inside the vehicle, the officers conducted a more thorough search of the vehicle which revealed two brick-shaped packages in a tire found in the trunk of the vehicle and additional packages in the front of the passenger compartment.

44. The two brick-shaped packages contained a white powdery substance that was later determined to consist of approximately 4.85 pounds of cocaine, and the other packages were later determined to contain approximately two pounds of methamphetamine.

45. Upon finding the cocaine and methamphetamine, Defendants were placed under arrest and transported to a police station in Albuquerque, New Mexico.

46. Approximately two to three hours after the search was completed, Defendants were advised in writing of their rights under Miranda v. Arizona, 384 U.S. 436 (1966). After receiving such advice, both Defendants read and signed forms waiving their Miranda rights and were then subjected to custodial interrogation.

## II.    LEGAL ANALYSIS AND CONCLUSIONS OF LAW

### A.    Reasonableness of the Traffic Stop

The Fourth Amendment to the United States Constitution protects Defendants' right to be secure in their persons and effects against unreasonable searches and seizures. "[A]utomobiles are 'effects' under the Fourth Amendment, and searches and seizures of automobiles are therefore subject to the constitutional standard of reasonableness." United States v. Chadwick, 433 U.S. 1, 12 (1977), overruled in part on other grounds, California v. Acevedo, 500 U.S. 565 (1991). In addition, "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of" the Fourth Amendment. Whren v. United States, 517 U.S. 806, 809-10 (1996). Thus, Defendants were seized within the meaning of the Fourth Amendment when Sergeant Valverde stopped the vehicle in which they were traveling to cite the driver for an equipment violation. See id.

Defendants have standing to challenge the seizure of their persons regardless of their possessory interest or property interest in the silver Caprice, see United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996), and it is the Government's burden to show that this warrantless seizure was reasonable, see United States v. Maestas, 2 F.3d 1485, 1491 (10th Cir. 1993). If the Government cannot meet this burden, then the evidence obtained as a result of the seizure must be suppressed unless it was obtained by "means sufficiently distinguishable to be purged of the primary taint" of the unlawful seizure. Wong Sun v.

United States, 371 U.S. 471, 487-88 (1963); see United States v. Erwin, 875 F.2d 268, 269 n.2 (10th Cir. 1989).

A seizure of a person during a traffic stop is "reasonable" under the Fourth Amendment "'if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.'" United States v. Callarman, 273 F.3d 1284, 1286 (10th Cir. 2001) (quoting United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (en banc)), cert. denied, 122 S. Ct. 1950 (2002). In determining whether an officer's suspicion is reasonable, the Court must consider the totality of the circumstances. See United States v. Arvizu, 122 S. Ct. 744, 750 (2002). "In examining the totality of the circumstances, '[c]ommon sense and ordinary experience are to be employed and deference is to be accorded to a law enforcement officer's ability to distinguish between innocent and suspicious actions.'" United States v. De La Cruz-Tapia, 162 F.3d 1275, 1277 (10th Cir. 1998) (quoting United States v. Wood, 106 F.3d 942, 946 (10th Cir. 1997)). Reasonable suspicion may be based on "'a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation.'" United States v. Lopez-Martinez, 25 F.3d 1481, 1484 (10th Cir. 1994) (quoting Terry v. Ohio, 392 U.S. 1, 22 (1968)). An officer cannot, however, predicate an investigative detention solely upon a hunch, see De La Cruz-Tapia, 162 F.3d at 1277, or rely solely upon generic facts that are so innocent or susceptible to varying interpretations as to be innocuous, see Wood, 106 F.3d at 94.

Prior to stopping the vehicle in this case, the officer suspected that the silver Caprice violated the window-tinting restrictions contained in New Mexico's Motor Vehicle Code. N.M. Stat. Ann. ch. 66, art. 1 through 8 (Michie 1978 & Supp. 2001). The relevant provisions of the Motor Vehicle Code state that:

**66-3-846. Windshields must be unobstructed and equipped with wipers; windows must be transparent; exception.**

A.    No person shall drive any motor vehicle with any sign, poster or other nontransparent material upon or in the front windshield, windows to the immediate right and left of the driver or in the rearmost window if the latter is used for driving visibility, except as provided in Section 66-3-846.1 NMSA 1978. The rearmost window is not necessary for driving visibility where outside rearview mirrors are attached to the vehicle.

. . . .

**66-3-846.1.    Sun screening material on windshields and windows; requirements; violation; penalty.**

A.    A person shall not operate on any street or highway a motor vehicle that is registered or required to be registered in this state if that motor vehicle has a sun screening material on the windshield or any window that does not comply with the requirements of this section.

B.    Except as otherwise provided in this section, a sun screening material:

(1)    when used in conjunction with the windshield, shall be nonreflective, shall not be red, yellow or amber in color and shall be used only along the top of the windshield, not extending downward beyond the ASI line or more than five inches from the top of the windshield, whichever is closer to the top of the windshield; and

(2)    when used in conjunction with the safety glazing materials of the side wings or side windows located at the immediate right and left of the driver, the side windows behind the driver and the rearmost window shall be nonreflective, shall have a light transmission of not less than twenty

-12-

percent and shall be used only on the windows of a motor vehicle equipped with one right and one left outside rearview mirror.

. . . .

E.        The provisions of this section do not apply to a motor vehicle registered in this state in the name of a person, or the person's legal guardian, who has an affidavit signed by a physician or an optometrist licensed to practice in this state that states that the person has a physical condition that makes it necessary to equip the motor vehicle with sun screening material that is in violation of this section.  The affidavit shall be in the possession of the person with such a physical condition, or the person's legal guardian, at all times while being transported in the motor vehicle.

F.        The light transmission requirement of this section does not apply to windows behind the driver on truck tractors, buses, recreational vehicles multipurpose passenger vehicles and motor homes. The provisions of this section shall not apply to motor vehicle glazing which complies with federal motor vehicle standards.

G.        The provisions of this section do not apply to motor vehicles that have sun screening material on the windshield or any window prior to the effective date of this section.

H.        As used in this section:

(1)        "light transmission" means the ratio of the amount of total light that passes through a product or material, expressed in percentages, to the amount of the total light falling on the product or material;

. . . .

(3)        "nonreflective" means designed to absorb light rather that [than] to reflect it; and

(4)        "sun screening material" means any film material, substance, device or product that is designed to be used in conjunction with motor vehicle safety glazing materials for reducing the effects of the sun.

I.      Any person who violates any provision of this section is guilty of a petty misdemeanor and upon conviction shall be punished by a fine of not more than seventy-five dollars ($75.00).

Id. §§ 66-3-846 and -836.1.

The Government has not cited any other provision of law that Defendants, or the vehicle in which they were traveling, were suspected of violating prior to the stop, nor does the record reflect any specific basis for initiating the stop other than the suspected equipment violation noted above.  In this regard, the Court specifically asked the officer whether there were any matters other than the dark tinting of the windows that he considered in stopping the vehicle, and the officer replied, "No, none whatsoever."  Thus, the question before the Court is limited to whether the officer had a reasonable articulable suspicion that the vehicle in which Defendants were traveling was in violation of Sections 66-3-846 and 66-3-846.1 of New Mexico's Motor Vehicle Code at the time he decided to stop the vehicle.[1]

According to the officer's testimony, prior to the stop he observed that the silver Caprice's windows were reflective and "very dark," which reasonably suggested to him that some of the vehicle's windows did not have a twenty-percent light transmission level and were not "nonreflective" under Section 66-3-846.1(B) of the Motor Vehicle Code.  The

---

[1]During closing argument, counsel for the Government mentioned the existence of an Arizona statute regarding window-tinting.  See Ariz. Rev. Stat. § 28-959.01 (1997).  No evidence was presented, however, that the officer knew of or considered the particular requirements of the Arizona statute.  Further, in contrast to the Kansas license-plate statute at issue in United States v. Ramstad, 120 F. Supp. 2d 973, 978 (D. Kan. 2000) (citing Kan. Stat. Ann. § 8-138a (1998)), the Government presented no authority in this case to show that the New Mexico officer had the power to enforce Arizona's window-tinting statute or that the requirement of compliance with the Arizona window-tinting statute was incorporated into New Mexico law.

-14-

officer also testified, however, that he observed an Arizona license plate clearly displayed on the back of the silver Caprice prior to the stop.

The officer acknowledged at the hearing that the window-tinting restrictions in Sections 66-3-846 and 66-3-846.1 of the Motor Vehicle Code do not apply to vehicles that are neither registered in New Mexico nor required to be registered in this state.  This conclusion is consistent with the plain meaning and the structure of these provisions of the Motor Vehicle Code, as well as the principle that "penal statutes are to be strictly construed." United States v. Miller, 146 F.3d 274, 278 (5th Cir. 1998); accord United States v. Fernando, 745 F.2d 1328, 1329 (10th Cir. 1984).  Thus, the officer correctly interpreted the Motor Vehicle Code as exempting vehicles not registered or required to be registered in New Mexico from the window-tinting restrictions stated in Sections 66-3-846(A) and 66-3-846.1(B).

Nevertheless, the officer did not offer any specific reasons as to why the observation of Arizona license plates on the silver Caprice did not dispel the suspicion that the vehicle was in violation of Sections 66-3-846 and 66-3-846.1(B) of New Mexico's Motor Vehicle based on the exemption for vehicles that are not registered or required to be registered in New Mexico.  Further, the officer did not articulate any specific safety concern about the

tinted windows on the silver Caprice.[2]  For example, he did not state any specific concern

about whether the tinted windows were so dark as to impair the driver's visibility to an

unsafe degree or whether the windows were so reflective as to have a blinding effect on other

drivers.

Because "reasonable suspicion" requires "a particularized and objective basis," United

States v. Cortez, 449 U.S. 411, 417-418 (1981), the Court cannot rely on a generic inference,

unsupported by the record, that all windows which do not appear to meet the standards set

forth in Section 66-3-846.1(B) present such a safety hazard at all times and under all

conditions.  The statutory exceptions to the window-tinting restrictions in the Motor Vehicle

Code, as well as the New Mexico appellate court's interpretation of that code, also suggest

that a more fact-specific approach is necessary in this context.  See Munoz, 1998-NMCA-10,

¶ 14; N.M. Stat. Ann. § 66-3-846 (referring to exceptions provided in Section 66-3-846.1);

id. § 66-3-846.1(A) (applying window-tinting restrictions to motor vehicles "registered or

required to be registered in this state"); id. § 66-3-846.1(E) (providing exception for persons

with physical conditions that make it necessary to equip their motor vehicles with sun

screening material that is in violation of this section); id. § 66-3-846.1(F) (providing

---

[2]The Court acknowledges that in addition to their law enforcement responsibilities, state police officers in New Mexico may have the authority to perform "community caretaker" functions in order to protect public safety.  These functions sometimes may warrant stopping a vehicle to warn of, or correct, a particular safety hazard.  See, e.g., Apodaca v. Taxation & Revenue Dep't, 118 N.M. 624, 626, 884 P.2d 515, 517 (Ct. App. 1994); State v. Mitchell, 498 N.W.2d 691, 693-94 (Iowa 1993).  In addition, there are some conditions which may give rise to a reasonable suspicion that a more general provision of the Motor Vehicle Code regarding unsafe equipment is being violated, see N.M. Stat. Ann. § 66-3-801(A) (Michie 1978 and Supp. 2001), provided that the record contains a sufficiently specific articulation of the factual basis for concluding that the condition of the equipment is unsafe, see State v. Munoz, 1998-NMCA-140, ¶¶ 14-16, 125 N.M. 765, 965 P.2d 349 (1998).

exception for "motor vehicle glazing that complies with federal motor vehicle safety standards"); id. § 66-3-846.1(G) (providing exception for "motor vehicles that have sun screening material on the windshield or any window prior to the effective date of this section").

In conducting such a fact-specific inquiry, the Court acknowledges that probable cause and, by implication, the lesser standard of reasonable suspicion, do "'not require the same type of specific evidence of each element of the offense as would be needed to support a conviction.'" United States v. Pollack, 895 F.2d 686, 691 (10th Cir. 1990) (quoting Adams v. Williams, 407 U.S. 143, 148-49 (1972)). But cf. Easyriders Freedom F.I.G.H.T. v. Hannigan, 92 F.3d 1486, 1499 (9th Cir. 1996) (concluding that although an officer generally need not have probable cause for every element of an offense in order to reasonably believe that a crime has occurred, the officer must have probable cause for the element of specific intent when specific intent is a required element of the offense). Thus, an officer who observes darkly-tinted or reflective windows on a vehicle in New Mexico ordinarily would not be required to disprove every possible exception to the window-tinting restrictions in Section 66-3-846 and 66-3-846.1 in order to establish the reasonable suspicion required to stop that vehicle.

On the other hand, the requirement that a vehicle be registered in New Mexico after the expiration of the 180-day grace period for nonresidents provided in the State's Motor Vehicle Code, N.M. Stat. Ann. § 66-3-301(A), is not simply an element of the window-tinting offense defined by Section 66-3-846.1. Rather, a violation of this registration

requirement is defined as a misdemeanor in and of itself regardless of whether the vehicle that is required to be registered in New Mexico has tinted windows.  See id. § 66-8-7(A).

Moreover, the Court is not entitled to exclude relevant and otherwise admissible evidence from consideration when examining the totality of the circumstances.  See Arvizu, 122 S. Ct. at 752.  Because the Government bears the burden of proving the reasonableness of a warrantless search, the Court does not view the evidence presented at a suppression hearing in the light most favorable to the Government and ignore all contrary evidence.  See United States v. Finefrock, 668 F.2d 1168, 1170-71 (10th Cir. 1982).  Rather, all of the evidence must be "fairly and evenhandedly weighed" without being viewed "in a light favorable to either side."  Id. at 1171.

Accordingly, the Court must consider not only the facts known to the officer which tend to confirm the officer's suspicions, but also those facts known to the officer which tend to dispel his or her suspicions.  Cf. Florida v. Royer, 460 U.S. 491, 500 (1983) ("[T]he investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.") (Emphasis added.)  In this case, the Arizona license plate clearly displayed on the rear of the silver Caprice and observed by the officer as he traveled on the interstate highway prior to the stop tends to dispel the suspicion that the vehicle was registered in New Mexico or required to be registered in New Mexico because the display of current license plates on a vehicle is "evidence that the vehicle is properly registered."  Delaware v. Prouse, 440 U.S. 648, 660 (1979); cf. Ariz. Rev. Stat. § 28-2351(A) (2000) ("The department shall provide to every

owner one license plate for each vehicle registered."); N.M. Stat. Ann. § 66-3-14 ("The department upon registering a vehicle shall issue a registration plate or a validating sticker to the owner of the vehicle.").

While the presence of an Arizona license plate on the vehicle does not necessarily end the inquiry, it is well established that:

> except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment.

Prouse, 440 U.S. at 663. Thus, in the absence of some objective and particularized reason for suspecting that the license plate on a vehicle traveling on an interstate highway is not valid evidence of its registration, the Fourth Amendment generally does not permit a police officer to stop that vehicle solely to search for further documentary evidence of its registration status in this context.

Prior to the stop in this case, the officer did not call the police dispatcher to run a check of the vehicle's license plate, and he did not have a specific, articulable, and objective basis for suspecting that the silver Caprice displaying an Arizona license plate was not properly registered or that its driver was unlicensed. Further, the officer observed no violation of any traffic laws and had no specific concerns about safety risks to other drivers. Under the totality of the circumstances prior to the stop, including the absence of any specific, articulable safety concern and the presence of an Arizona license plate on the

vehicle as it traveled on an interstate highway, the fact that the vehicle's windows were tinted and reflective did not give rise to a reasonable suspicion that the vehicle was subject to seizure for a violation of New Mexico's Motor Vehicle Code. Thus, under the standard set forth in <u>Prouse</u>, 440 U.S. at 663, the stop of the silver Caprice in which Defendants were traveling was unreasonable under the Fourth Amendment.

**B.     <u>Suppression of the Evidence</u>**

The Court next addresses whether the physical evidence and statements obtained after the initial stop of Defendants and the vehicle in which they were traveling must be suppressed as "fruit of the poisonous tree." <u>See</u> <u>Wong Sun</u>, 371 U.S. at 487-88. The Government contends that the evidence and statements were obtained by "means sufficiently distinguishable to be purged of the primary taint" of the unlawful detention, <u>id.</u>, because Defendants allegedly consented to the officer's search of the silver Caprice's passenger compartment with his dog, and the dog's alert established probable cause to search the remainder of the vehicle and its contents. Defendants contend, on the other hand, that the Defendants' consent as well as the subsequent search and custodial interrogation were tainted by the unlawfulness of the stop which preceded it.

In determining whether Defendants' consent and the ensuing search and interrogation are tainted by the unlawful detention, the Court considers the totality of the circumstances, with particular attention to the temporal proximity between the unlawful detention and the consent to the search, the presence of intervening circumstances, and the purpose (or flagrancy) of the official misconduct. <u>See</u> <u>Brown v. Illinois</u>, 422 U.S. 590, 603-04 (1975);

United States v. Melendez-Garcia, 28 F.3d 1046, 1054 (10th Cir. 1994).  When a consensual search is preceded by a Fourth Amendment violation, "the government [must] show that consent is voluntary in fact," and "it must also demonstrate a break in the causal connection between the illegality and the" evidence thereby obtained.  Id.

In this instance, the officer's request to search the vehicle occurred within a few minutes after he issued the traffic citation for having windows that were "too dark" and initiated further questioning about the presence of illegal drugs.  The officer knew that the citation was invalid at the time he issued it because of the vehicle's Arizona license plate and the Arizona registration form that he had reviewed and discussed with his dispatcher.  In addition, the officer had already called his dispatcher to summon backup assistance from other officers before he issued the citation.

After issuing the citation, Sergeant Valverde indicated to Defendant Tamayo-Arechiga that there was a "little problem" and proceeded to question him about illegal drugs.  This line of questioning was the foreseeable, planned outcome of the unlawful detention, and there were no intervening circumstances that would indicate a break in the causal connection between the initial detention and the search that followed it.  Accordingly, the Court concludes that the incriminating evidence and statements were a product of the illegal stop and must be suppressed.

## III.  **CONCLUSION**

Because the Government did not meet its burden of proving that the warrantless traffic stop in this case satisfied the Fourth Amendment's requirement of reasonableness, and the

evidence and statements subsequently obtained by the Government are tainted by the unlawfulness of the stop, such evidence and statements must be suppressed pursuant to the exclusionary rule.

**IT IS, THEREFORE, ORDERED** that Defendants' Motion to Suppress be and hereby is **GRANTED**.

Dated in Albuquerque this 16th day of August, 2002.

**M. CHRISTINA ARMIJO**
United States District Judge

Counsel for the Government:
    **Rhonda P. Backinoff**
    Assistant U.S. Attorney
    Albuquerque, New Mexico

Counsel for Defendant Gerardo Lechuga-Labrada:
    **Richard Winterbottom**
    Albuquerque, New Mexico

Counsel for Defendant Edgar Tamayo-Arechiga
    **Roberto Albertorio**
    Albuquerque, New Mexico